UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| I.A., | ) |
| | ) |
| Plaintiff, | )   Civil Action No. |
| | )   23-10170-FDS |
| v. | ) |
| | ) |
| COMMISSIONER OF THE SOCIAL | ) |
| SECURITY ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION FOR ORDER
<u>AFFIRMING THE DECISION OF THE COMMISSIONER</u>**

**SAYLOR, C.J.**

This is an appeal of the final decision of the Commissioner of the Social Security Administration denying the application of plaintiff I.A. for Social Security Disability benefits. The Commissioner determined that I.A. was not disabled within the meaning of the Social Security Act. Plaintiff appeals the Commissioner's denial of her claim on the ground that the decision is not supported by substantial evidence as required by 42 U.S.C. § 405(g). Specifically, I.A. contends that the commissioner erred by improperly evaluating the medical opinions of the state agency physicians and failing to address the moderate limitations assessed by one of these physicians.

Plaintiff has moved for judgment on the pleadings and defendant has moved for an order affirming the decision of the Commissioner. For the reasons stated below, the Commissioner's decision will be affirmed and plaintiff's motion will be denied.

I.      **Background**

The following is a summary of the evidence as set forth in the administrative record.

A.      **Educational and Occupational History**

I.A. was born on March 14, 1963, and is currently 60 years old. (A.R. 88). She was 55 years old at the alleged onset of her disability on October 20, 2018. (*Id.* at 312).

I.A. has a college degree. (*Id.* at 88). She last worked in 2019 as a private caregiver. (*Id.* at 357). In 2018, she was a Medicaid specialist. (*Id.* at 357). From 2017-2018, she worked as a nursing assistant. (*Id.*). In 2017, she also worked as an outreach and enrollment specialist for a health center and a health aide at a senior home. (*Id.*). From 2015-2016, she worked as a phlebotomist. (*Id.*). From 2011-2012 and 2014-2016, she worked as a nursing assistant. (*Id.*).

B.      **Medical History**

I.A. alleges that she is unable to work due to various physical and mental impairments. (*Id.* at 89).

On October 18, 2017, I.A. saw Dr. Bernard J. Durante complaining of ear discomfort. (*Id.* at 433). Dr. Durante diagnosed tinnitus in her left ear and sensorineural hearing loss in both ears. (*Id.* at 434). He ordered a retrocochlear study. (*Id.*).

On October 18, 2017, I.A. saw Megan Spriegel, Au.D., for a comprehensive hearing test and Dr. Eunyoung Won, Au.D., for hearing test analysis. (*Id.* at 436, 442). Dr. Won identified "normal hearing sensitivity sloping to an asymmetrical high frequency sensorineural hearing loss, worse in the left ear." (*Id.* at 442). She further noted that I.A. had "excellent" word recognition in her right ear, but only "fair" recognition in her left ear. (*Id.*).

On August, 22, 2019, Lauren Dibona, a physician's assistant, began treating I.A. (*Id.* at 480). She noted that I.A. reported "some problems with memory and forgetfulness" and

2

"tinnitus in her left ear." (*Id.* at 482). In addition, she noted that I.A. reported mood as "always a problem," a "history of depression", and "not feel[ing] functional." (*Id.* at 482).

On September 10, 2019, I.A. saw Dr. Richard S. Hill for her tinnitus. (*Id.* at 445-46). I.A. reported that she believed that her hearing was "getting worse especially in the left year," and that her tinnitus was negatively impacting her ability to drive. (*Id.* at 445). Dr. Hill informed her that the examination was "essentially normal," but wanted her to receive a new audiogram. (*Id.* at 446).

On September 26, 2019, I.A. saw Maria Eden Gianan, a nurse practitioner. (*Id.* at 532). She reported feeling depressed, anxious, and "despised" by her family. (*Id.*). She noted that her energy is "so-so," her tinnitus does not allow her to sleep, and she feels ready for bed after 4 p.m. (*Id.*). Ms. Gianan prescribed Seroquel. (*Id.* at 533).

On March 26, 2020, I.A. again saw Ms. Gianan. (*Id.* at 534-44). She reported visiting her family and having the flu, which negatively impacted her sleep and anxiety. Nevertheless, she noted that she was beginning to sleep better and needed a three-month supply of Seroquel for upcoming travel. (*Id.* at 534). Ms. Gianan observed that I.A. was "still depressed but not suicidal." (*Id.*). She diagnosed bipolar II disorder and persistent depressive disorder (dysthymia). (*Id.* at 544).

On July 24, 2020, I.A. again saw Ms. Dibona. (*Id.* at 601-07). Ms. Dibona noted that I.A. was experiencing a "long standing" depressive disorder that had become "worst over the last 2-3 years" as well as tinnitus in the left ear. (*Id.* at 601). She advised continued self-care and described I.A.'s recurrent major depressive disorder as "moderate." (*Id.*).

On August 20, 2020, I.A. again saw Ms. Dibona. (*Id.* at 661-63). I.A. reported feeling "very nervous" about her sister's breast-cancer diagnosis but stated that she was "otherwise feeling well." (*Id.* at 663).

On October 26 and November 10, 2020, I.A. saw Dr. Angel Johnson reporting nocturia and overactive bladder. (*Id.* at 584 and 593). Dr. Johnson ordered a kidney and bladder ultrasound, and results appeared normal. (*Id.* at 585).

On November 12, 2020, Martha Root, P.C.N.S., treated I.A. for the first time. (*Id.* at 563-67). I.A. reported worsening bipolar depression and difficulty "functioning from day to day." (*Id.* at 565). She also reported "increased suicidal ideations about not wanting to live but denie[d] having a plan." (*Id.* at 566). Ms. Root noted that I.A.'s symptoms were consistent with diagnoses of bipolar disorder and unspecified anxiety disorder. (*Id.* at 565-66). She prescribed discontinuing Prozac and starting both Lexapro and Lamotrigine. (*Id.* at 566.).

On November 25, 2020, I.A. underwent an electrocardiogram with Dr. Andrew Kriegel after experiencing chest pain. (*Id.* at 559-61). He noted that her electrocardiogram was normal and that the chest pain was likely "brought on by emotional stress." (*Id.* at 560).

On May 5, 2021, I.A. had a telehealth visit with Dr. Kenneth Grundfast concerning her tinnitus and associated vertigo. (*Id.* at 620-23). He confirmed her prior diagnosis of tinnitus in the left ear and ordered vestibular function and hearing tests to confirm her reported hearing loss. (*Id.* at 623). She reported that she "only sleeps 2 hours per night" and is "now so afraid of falling that she walks with a cane." (*Id.* at 620).

      C.      **Additional Medical Examinations or Opinions**

On April 15, 2020, Dr. Alice Truong performed a consultative evaluation of I.A. (*Id.* at 118). Dr. Truong observed that she presented well with "normal thought processes and content"

and "normal speech but flat affect" (*Id.*). While I.A. did not report hearing issues during her interview, Dr. Troung noted "high frequency asymmetric sensorineural hearing loss involving the left ear" and "fair" word discrimination. (*Id.*). Dr. Troung assessed her as having "no severe physical impairment." (*Id.*).

On May 7, 2020, Dr. Steven Fischer, Psy.D., completed a review of I.A.'s impairments and performed a mental Residual Functional Capacity (RFC) assessment. (*Id.* at 118-21). He concluded that she is mildly limited in her ability to interact with others; mildly limited in her ability to adapt or manage herself; and moderately limited in her ability to concentrate, persist, or maintain pace. (*Id.* at 119). He stated that she has "benign mental status and mild to moderate depression in the context of psychosocial stressors," and is "lonely, sad, [and with] no support system in place." (*Id.*). As to her "sustained concentration and persistence," he assessed that she is moderately limited in her ability to "complete a normal workday and work-week without interruptions from psychologically-based symptoms," but could "carry out instructions in a normal workday/workweek" (*Id.* at 121).

On August 26, 2020, Carol E. Montgomery, Ph.D., completed a consultative evaluation of I.A. and performed a mental RFC assessment. (*Id.* at 167-69, 172-74). Dr. Montgomery concluded that she is limited in the same activities and to the same degree that Dr. Fischer had previously identified, with two exceptions: Dr. Montgomery found that she is also moderately limited in her ability to "maintain attention and concentration for extended periods" and moderately limited in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." (*Id.* at 173).

On November 10, 2020, Dr, Richard Goulding performed a physical RFC assessment of I.A. (*Id.* at 149-51). As to her communicative limitations, he concluded that she may be limited

in her ability to "work with the public and on the phone" due to her high frequency hearing loss. (*Id.* at 149-50). Dr. Goulding found that her "word discrimination was 80% in the left ear and 92% on the right." (*Id.* at 150). As to her environmental limitations, he assessed that she should "avoid concentrated exposure" to noise. (*Id.*).

On August 30, 2021, Ms. Root completed a mental RFC assessment of I.A. (*Id.* at 636-38). As to her limitations in understanding, Ms. Root concluded that she suffers from depression. (*Id.* at 638). Ms. Root reported that "she has problems with recall and [her] cognitive abilities are slowed." (*Id.*). As a result, she "lacks proper memory for working a [full-time] job." (*Id.*). Ms. Root noted that I.A. is "markedly limited" in all categories evaluated during the mental RFC assessment except for her "ability to maintain socially appropriate behavior" and "ability to be aware of normal hazards and precautions." In these two categories, I.A. was deemed only "moderately limited." (*Id.* at 636-37).

D.  **Hearing Testimony**

I.A. testified at a remote hearing before the Administrative Law Judge on September 8, 2021. (*Id.* at 82-109). She stated that she is unable to work because of her bipolar disorder, tinnitus, moodiness, difficulty concentrating, and forgetfulness. (*Id.* at 89). She testified that she takes several medications for her mental-health impairments, but the side effects of those medications include sleepiness, dizziness, dry mouth, and constipation. (*Id.* at 90). She also testified that she hears ringing "constantly" due to her tinnitus, made worse by "driving[,] any loud noise like music, [and] people talking loud[ly]." (*Id.* at 90-91). She stated that she is "very anxious" and "depressive most of the time." Once a month she will go without sleep for three or four days, resulting in weeks of depression. (*Id.*).

As to her daily activities, I.A. testified that she gets up around 11:00 a.m., drinks

coffee that her roommate has prepared for her, reads her Bible, and eats breakfast. (*Id.*). She then normally goes back to bed because she does not feel like "going out of the house or do[ing] much of anything." (*Id.*). After I.A. gets up again, she makes herself lunch, watches television, and lays on the couch until her roommate makes her dinner. (*Id.* at 92). She testified that she feels uncomfortable using the stove because she fears that she will leave it on. (*Id.*). She stated that at 9:00 p.m., she usually takes her medication, and then goes to bed. (*Id.*).

She explained that she lacks motivation to do household chores, that her room is a mess, and that she struggles to keep things organized. (*Id.*). She noted that going to church keeps her calm, but she otherwise does not have a desire to be out in public. (*Id.* at 92-93).

I.A. also discussed her past work experience. (*Id.* at 93-96). She explained that she worked to help people enroll in MassHealth, but that that work was conducted by telephone, which was frustrating due to her tinnitus. (*Id.* at 93). She testified that in 2015, she worked as a phlebotomist. (*Id.* at 94). The position was difficult for her due to the night-shift schedule, and she "made a lot of mistakes." (*Id.*). She would hide her mistakes so she would not get fired. (*Id.*). In 2014, she provided at-home health-care services. (*Id.*). She noted that she also worked as a residential supervisor with disabled kids, but quit because they were "violent and loud." (*Id.* at 95). She also testified that she worked as a medical assistant in a doctor's office. (*Id.* at 95-96).

The ALJ asked the vocational expert if there were any jobs in the national economy for someone who can perform work at all exertional levels but who must avoid exposure to heavy machinery, moving mechanical parts, and unprotected heights; would be able to understand, remember, and carry out simple and routine instructions for two-hour intervals

during an eight-hour workday in a 40-hour work-week; cannot perform work that requires communication with the general public or communication by telephone as a function of the job; and can tolerate moderate exposure to noise. (*Id.* at 102). The vocational expert testified that there were the following jobs available in the national economy: commercial cleaner; office cleaner; hospital cleaner; and hospital food service worker. (*Id.* at 102-03). However, the vocational expert did note that these jobs would not be available to such an individual if they were either "off task" for twenty percent of the day, or absent from work two days per month. (*Id.* at 103).

### E. Procedural History

On October 8, 2019, I.A. applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits, alleging that she became disabled on October 20, 2018. (*Id.* at 61). The Commissioner denied her claim on May 7, 2020, and upon reconsideration on February 4, 2021. (*Id.* at 180-82, 198-200). Thereafter, she filed a written request for a hearing. (*Id.* at 204-05). The hearing was held on September 8, 2021. (*Id.* at 82-109). She appeared remotely and testified at the hearing. (*Id.*). James Sarno, a vocational expert, also testified at the hearing. (*Id.*).

On October 14, 2021, the ALJ concluded that I.A. was not disabled. (*Id.* at 58-76). She requested a review of the ALJ's decision. (*Id.* at 309-11). On October 4, 2022, the Appeals Council declined to review the decision and adopted it as the final decision of the Commissioner. (*Id.* at 17-19). This appeal followed.

## II.     Analysis

### A.     Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The Commissioner's factual findings, "if supported by substantial evidence, shall be conclusive," *id.*, because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ." *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001); *see Evangelista v. Secretary of Health & Human Servs.*, 826 F.2d 136, 143-44 (1st Cir. 1987). Therefore, "[j]udicial review of a Social Security claim is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

However, the Court may reverse or remand the ALJ's decision if the ALJ ignored evidence or made legal or factual errors. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings . . . are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."); *Moore v. Astrue*, 2013 WL 812486, at *2 (D. Mass. Mar. 2, 2013) ("[I]f the ALJ made a legal or factual error, the Court may reverse or remand such decision . . . ."). Accordingly, if the "ALJ failed to record consideration of an important piece of evidence that supports [the claimant's] claim and, thereby, left unresolved conflicts in the evidence, [the] Court can not conclude that there is substantial evidence in the record to support the Commissioner's decision." *Nguyen v. Callahan*, 997 F. Supp. 179, 183 (D. Mass. 1998); *see also Crosby v. Heckler*, 638 F. Supp. 383, 385-86 (D. Mass. 1985) ("Failure to provide an adequate basis for the reviewing court to determine whether the administrative

decision is based on substantial evidence requires a remand to the ALJ for further explanation."). Questions of law are reviewed de novo. *Seavey*, 276 F.3d at 9.

### B. Standard for Entitlement to SSDI Benefits

In order to qualify for society security disability insurance ("SSDI") benefits or SSI benefits, the claimant must demonstrate that he or she is "disabled" within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423(d) (setting forth the definition of "disabled" in the context of SSDI); 42 U.S.C. §§ 1382c(a)(1), 1382c(a)(3)(A) (same in the context of SSI). "Disability" is defined, in relevant part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairment must be severe enough to prevent the claimant from performing not only past work, but any substantial gainful work existing in the national economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.960(c)(1).

The Commissioner uses a sequential five-step process to evaluate whether a claimant is disabled. *See Mills v. Apfel*, 244 F.3d 1, 2 (1st Cir. 2001); 20 C.F.R. § 416.920. Those steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 416.920(a)(4). "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national

10

economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). At that juncture, the ALJ assesses the claimant's RFC in combination with the vocational factors of the claimant's age, education, and work experience, to determine whether he or she can engage in any kind of substantial gainful work which exists in the national economy. 20 C.F.R. §§ 416.920(g), 416.960(c).

      C.      **The Administrative Law Judge's Findings**

In evaluating the evidence, the ALJ followed the established five-step procedure set forth in 20 C.F.R. § 416.920(a)(4).

At step one, the ALJ found that I.A. had not engaged in "substantial gainful activity since October 25, 2019, the alleged onset date." (A.R. at 64).

At step two, the ALJ addressed the severity of I.A.'s impairments. She concluded that I.A. had the following severe impairments: hearing loss, depressive disorder, and bipolar disorder. (*Id.*). She found that those impairments significantly limited I.A.'s ability to perform basic work activities as required by SSR 85-28. (*Id.*).

At step three, the ALJ found that those impairments, or their combination, did not meet or medically equal the severity of the requirements of a listed impairment under 20 C.F.R. Part 404, Subpart P, App'x 1. (*Id.* at 65). She stated that I.A.'s "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04" and noted that, "[i]n making [that] finding, the undersigned has considered whether the 'paragraph B' criteria [were] satisfied." (*Id.*).

"To satisfy the paragraph B criteria, [the] mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." 20 C.F.R. Part 404, Subpart P, App'x 1, 12.00 Mental Disorders. Those four areas are:

11

"[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.*

The ALJ concluded that the "paragraph B" criteria were not met because I.A. had only a mild limitation in interacting with others and adapting or managing herself, and only a moderate limitation in concentrating, persisting, or maintaining pace. (A.R. at 65-66). In addition, she found that she did not satisfy the "paragraph C" criteria because the "evidence fail[ed] to establish" that criteria. (*Id.* at 67).

After consideration of the record, the ALJ concluded that I.A. has the residual functional capacity to perform work subject to certain nonexertional limitations. (*Id.*). The ALJ found that she cannot perform work that requires communication with the public or communication by telephone as a function of the job. (*Id.*). She also must avoid exposure to hazards such as heavy machinery, moving mechanical parts, and unprotected heights. (*Id.*). The ALJ concluded that she can tolerate moderate exposure to noise, and that she can understand, remember, and carry out simple and routine instructions for two-hour intervals during an eight-hour workday in a 40-hour work-week. (*Id.*).

In making that finding, the ALJ followed a two-step process. (*Id.* at 67-68). First, she considered whether there were underlying medically determinable physical or mental impairments—that is, impairments that could be shown by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce I.A.'s pain or other symptoms. (*Id.* at 68). Second, she evaluated the intensity, persistence, and limiting effects of those symptoms to determine the extent they limited her work-related activities. (*Id.*). For that purpose, whenever statements about those symptoms were not substantiated by objective

medical evidence, she considered other evidence in the record to determine if the symptoms limited her ability to perform work-related activities. (*Id*. at 68-73).

At the first step of the two-step process, the ALJ determined that I.A.'s medically determinable impairments could reasonably be expected to cause the alleged symptoms. (*Id.* at 68). However, at the second step, she found that I.A.'s statements about the intensity, persistence, and limiting effects of her symptoms were not consistent with the medical evidence and other evidence in the record. (*Id.* at 68-73). Specifically, she found that her statements were inconsistent with medical evidence showing that her anxiety and depression are exacerbated "during times of situational stress." (*Id.* at 71). She further found that medical evaluations show that she is psychiatrically stable when taking her prescribed medication. (*Id.*). She further noted that the evidence does not suggest limitations in her ability to ambulate or perform other physical activities. (*Id.*). Finally, she observed that she has not undergone a recent hearing test, and there is no MRI in the record to support her testimony as to the severity of her hearing loss. (*Id.*).

In making those determinations, the ALJ stated that she did not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical findings or medical opinions. (*Id.* at 72). She found the limitations given by the state agency consultants persuasive overall because they "are not inconsistent with the medical evidence as a whole." (*Id.*). She concluded that the mental RFC assessment of Ms. Root, which reported slowed recall and cognition abilities due to depression and anxiety, was of "little persuasive value" because it "does not provide a sufficient function-by-function analysis to justify these severe limitations." (*Id.* at 72-73).

The ALJ determined that I.A. is unable to perform past relevant work under 20 C.F.R. §§ 404.1565, 416.965. (*Id.* at 73). She noted that according to the vocational expert, "[an]

13

individual with [her] limitations would be unable to perform [her] past relevant work as actually or generally performed." (*Id.*).

At step five, the ALJ considered I.A.'s age, education, work experience, and RFC. Taking all of those factors into account, she found that a significant number of jobs existed in the national economy that I.A. could perform. (*Id.*); *see also* 20 C.F.R. §§ 416.969, 416.969a. To determine the extent that her limitations impede her ability to perform unskilled work at all exertional levels, the ALJ asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and RFC. (A.R. at 74). The vocational expert testified that a person with her characteristics could work in representative occupations such as commercial cleaner; office cleaner; hospital cleaner; and hospital food service worker. (*Id.*). The ALJ concluded that after considering her characteristics, she could make a successful adjustment to work that exists in significant numbers in the national economy, and that therefore she was not disabled within the meaning of the Social Security Act. (*Id.*).

### D.     **Plaintiff's Objections**

Plaintiff raises two principal objections to the ALJ's determination that she is not disabled: (1) that the ALJ failed to adequately evaluate the opinions of Dr. Montgomery and Dr. Fischer and (2) that the ALJ failed to include an adequate assessment of I.A.'s moderate limitations as reported by Dr. Montgomery in her RFC findings.

#### 1.     **Medical Opinions of Dr. Montgomery and Dr. Fischer**

Plaintiff first contends that the ALJ's finding is not supported by substantial evidence because she did not expressly address the limitations noted by Dr. Montgomery and Dr. Fischer despite finding those opinions persuasive. She asserts that the ALJ incorrectly stated that the

14

state agency consultants' opinions were consistent with each other. She further contends that that error is not harmless because a proper evaluation of the medical opinions might have resulted in a different finding.

An ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c. When determining what weight to assign to a medical source opinion, the ALJ must consider the opinion's "supportability, consistency, relationship, specialization, and other factors." *Harrison v. Saul*, 2021 WL 1153028, at *5 (D. Mass. Mar. 26, 2021). "The most important factors to be considered when the Commissioner evaluates persuasiveness are supportability and consistency; these are usually the only factors the ALJ is required to articulate." *Id.* "ALJs must consider the persuasiveness of all medical opinions in a claimant's case record and need not defer to the medical opinions of a claimant's treating physicians." *Id.* This means that "[a] medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, [is] not . . . persuasive regardless of who made the medical opinion." *Id.* (quoting REVISIONS TO RULES REGARDING THE EVALUATION OF MEDICAL EVIDENCE, 82 Fed. Reg. 5844, 5854 (Jan. 18, 2017)). "An ALJ's decision to accord a treating physician's opinion with little weight will be sustained on review so long as one of the reasons given by the ALJ is proper and adequately supported." *Id.* at *6.

Here, Dr. Fischer and Dr. Montgomery both found I.A.'s bipolar disorder to be a severe impairment that moderately limited her ability to concentrate. (A.R. at 118-21, 152, 167-68). The ALJ noted that she found all of the state agency consultants persuasive in part because their "finding of insufficient evidence to determine a severe impairment [is] consistent with the longitudinal treatment record." (*Id.* at 72). However, both doctors clearly did find a severe

15

impairment.  (*Id.* at 119, 167).  Plaintiff contends that the ALJ's error shows that she failed to adequately analyze the persuasiveness of the state agency medical reports.  *See Harrison*, 2021 WL 1153028, at *5.

While the ALJ incorrectly noted that the state agency consultants did not find a severe impairment, she nonetheless found bipolar disorder and depression to be severe impairments at step two.  (A.R. at 64, 72-73).  That finding is consistent with the reports of Dr. Fischer and Dr. Mongomery, and is favorable to I.A.  (*Id.*); *Harrison*, 2021 WL 1153028, at *5.  Her conclusion as to the severity of her bipolar disorder is therefore accurately based on the medical reports of the state agency consultants.  *See Harrison*, 2021 WL 1153028, at *6.

Thus, the ALJ's evaluation of the persuasiveness of the state agency consultants does not support remand, because it would only serve to correct one sentence in the ALJ opinion that (while incorrect) was not dispositive against I.A.  *Perez Torres v. Secretary of Health & Human Servs.*, 890 F.2d 1251, 1255 (1st Cir. 1989) (holding ALJ's error harmless where the record supports ALJ's conclusion); *see also Ward*, 211 F.3d at 656 (noting remand not essential where it will amount to empty explanatory exercise for the ALJ).  Despite the favorable finding of a severe impairment, the ALJ nonetheless found that I.A. retained the residual functional capacity to perform many basic activities associated with work.  (A.R. at 74).

### 2.     **Evidence Concerning Plaintiff's Mental-Health Limitations**

Plaintiff also contends that the ALJ ignored evidence concerning her mental-health limitations.  She asserts that the ALJ did not discuss medical findings of a moderate limitation in her ability to maintain regular attendance.  Specifically, she asserts that she neglected to address absenteeism related to her moderate limitation in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," as noted by

16

Dr. Montgomery. (*Id.* at 173). [1] The Commissioner contends that that apparent oversight is not cause for remand and that the ALJ offered multiple reasons for finding that her symptoms were not disabling.

The "substantial evidence" standard is one where "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." *Miranda v. Secretary of Health, Ed. & Welfare*, 514 F.2d 996, 998 (1st Cir. 1975); *Sousa v. Astrue*, 783 F. Supp. 2d 226, 232 (D. Mass. 2011). Accordingly, the ALJ must review all the relevant evidence. *See Sousa*, 783 F. Supp. 2d at 232; SSR 16-3p. However, the ALJ is not required to discuss every piece of evidence in the record when making his or her decision. *Santiago v. Secretary of Health & Human Servs.*, 1995 WL 30568, at *4 (1st Cir. Jan. 25, 1995); *Sousa*, 783 F. Supp. 2d at 234 ("The hearing officer is not required to—nor could [she] reasonably—discuss every piece of evidence in the record."). Moreover, even if one could come to a different conclusion than the ALJ, the question on judicial review is whether substantial evidence supports the ALJ's decision. *Robles v. Barnhart*, 2005 WL 1773963, at *4 (D. Mass. 2005) ("If substantial evidence exists to support the ALJ's determination, the Court must accept [her] findings as conclusive even if the record arguably could justify a different conclusion."). A reviewing court may reverse or remand the ALJ's decision when the ALJ ignored evidence or made legal or factual errors. *Moore*, 2013 WL 812486, at *2; *Robles*, 2005 WL 1773963, at *4.

Here, the ALJ noted that I.A.'s depression was consistently found to be mild or moderate, and correlates strongly with external stressors such as a poor night's sleep, becoming sick with

---

[1] In addition, I.A. contends that the ALJ inappropriately interpreted raw medical data as a layperson when finding that she can follow simple instructions for two-hour intervals during an eight-hour workday in a 40-hour work-week. (A.R. at 67). The ALJ's finding, however, appropriately reflects the limitations reported by Dr. Fischer and Dr. Montgomery. Following simple instructions for two-hour spans is consistent with their conclusion that I.A. can follow instructions during a typical workday. (A.R. at 121, 173).

the flu, or her sister's cancer diagnosis. (A.R. at 69). She further noted a history of mental status exams within normal limits. (*Id.* at 69-71). She also found that "treatment notes reflect mild to moderate symptoms of psychiatric impairment, but they do not reflect symptoms on a disabling level." (*Id.* at 71). While Dr. Montgomery found that I.A. had a moderate limitation in keeping regular attendance, Dr. Fischer found that she was not significantly limited in that area. (*Id.* at 152, 121).

While the ALJ did not specifically address issues related to absenteeism, or note that two doctors reached conflicting conclusions concerning I.A.'s limitations in maintaining regular attendance, those omissions need not result in remand where the record as a whole supports her determination. *See Ortiz v. Secretary of Health and Hum. Servs.*, 955 F.2d 765, 770 (1st Cir. 1991) (affirming ALJ's determination despite noting record could arguably support different conclusion)*; see also Sousa*, 783 F. Supp. 2d at 234 ("The fact that the hearing officer 'generally' agreed with the assessment of [the physician] did not mean that he was required to accept every statement in that assessment.").

The ALJ considered evidence from multiple sources, evaluated the record, and rendered a decision that was consistent with the evidence, and the RFC assessment by Dr. Fischer. Thus, the ALJ's determination is supported by substantial evidence and will be affirmed.

### III.    Conclusion

For the foregoing reasons, I.A.'s motion for judgment on the pleadings is DENIED, and defendant's motion to affirm the action of the Commissioner is GRANTED.

**So Ordered.**

Dated: January 3, 2024

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court